# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JIMMY CLUBB, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. CIV-15-985-HE ) |
| CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration, | ) ) ) ) ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Plaintiff, Jimmy Clubb, seeks judicial review of the Social Security Administration's denial of his applications for disability insurance benefits (DIB) and supplemental security income (SSI). Chief United States District Judge Joe Heaton has referred this matter for proposed findings and recommendations. *See* 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons set forth below, it is recommended that the Commissioner's decision be affirmed.

**I.    Procedural Background**

Plaintiff filed his applications for DIB and SSI on August 13, 2010, alleging a disability onset date of November 23, 2009. The Social Security Administration denied the application initially and on reconsideration. Following a hearing, an Administrative Law Judge (ALJ) issued a partially favorable decision. *See* Administrative Record (AR) [Doc. No. 13] at14-24. The Appeals Council denied Plaintiff's request for review, and this appeal followed.

**II.   The ALJ's Decision**

The ALJ followed the sequential evaluation process required by agency regulations. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (explaining five-step sequential evaluations process); *see also* 20 C.F.R. §§ 404.1520; 416.920. The ALJ first determined

Plaintiff had not engaged in substantial gainful activity since the onset date of the alleged disability. AR 16. At step two, the ALJ determined Plaintiff has two severe impairments: ischemic heart disease and bilateral hearing loss. *Id.* At step three, the ALJ found neither of Plaintiff's impairments meets or medically equals any of the presumptively disabling impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 16-17.

The ALJ next determined Plaintiff's residual functional capacity (RFC):

> After careful consideration of the entire record, the undersigned finds that since November 23, 2009, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with nonexertional limitations. The claimant can push/pull and lift/carry 10 pounds frequently and 20 pounds occasionally; sit for 6 of 8 hours, stand/walk for 6 of 8 hours. The claimant can never climb ladders, ropes or scaffolds and can never balance. The claimant should avoid all exposure to unprotected heights, hazardous unprotected machinery. The claimant can do no commercial driving. The claimant requires a quiet to moderate noise environment and must use ear protection in loud noise environment.

AR. 17. At step four, the ALJ concluded Plaintiff is unable to perform his past relevant work as assistant construction superintendent or welder. AR 22.

Based on the testimony of a vocational expert (VE), and using the Medical-Vocational Guidelines[1] (the grids) as a framework, the ALJ found at step five of the sequential evaluation that, prior to September 14, 2013, Plaintiff could have performed other jobs in the national economy including production solderer, small product assembler and garment bagger. AR 23. On September 14, 2013, however, Plaintiff's age category, for purposes of the grids, changed

---

[1] The Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, (the grids) are a tool to aid in making uniform, efficient decisions in determining the types and numbers of jobs existing in the national economy for certain classes of claimants. *Heckler v. Campbell*, 461 U.S. 458, 468 (1983). The grids are applicable, however, "only when they describe a claimant's abilities and limitations accurately." *Id.* 461 U.S. at 462 n. 5; *see also Channel v. Heckler*, 747 F.2d 577, 579 (10th Cir. 1984).

from "closely approaching advanced age" to "advanced age." Applying the grids directly to Plaintiff's vocational characteristics, the ALJ determined that as of September 14, 2013, Rule 202.06 directed a finding of "disabled." AR 24.

### III. Plaintiff's Claims

Plaintiff takes issue with the ALJ's RFC formulation; the treatment of an Agency doctor's opinion to which the ALJ gave great weight; the jobs identified by the VE at step five; the ALJ's alleged failure to consider nonsevere impairments; and the application of the Medical-Vocational Guidelines.

### IV. Standard of Review

Judicial review of the Commissioner's final decision is limited to determining whether the factual findings are supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Poppa v. Astrue*, 569 F.3d 1167, 1169 (10th Cir. 2009). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (quotation omitted).

A decision is not based on substantial evidence if other evidence in the record overwhelms the evidence upon which the ALJ relied, or if there is a mere scintilla of evidence supporting the decision. *Branum v. Barnhart*, 385 F.3d 1268, 1270 (10th Cir. 2004). The court "meticulously examine[s] the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (citations omitted). While the court considers whether the ALJ followed the applicable rules of law in weighing particular types of evidence in disability cases, the court does not reweigh the evidence or substitute its own judgment for that

of the Commissioner. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quotations and citations omitted).

V. <u>Analysis</u>

A. **The "RFC Error"**

Plaintiff alleges the ALJ erred in "failing to include any *proper* limitations" for Plaintiff's hearing deficits. [Doc. No. 16] at 4 (emphasis in original). He also challenges aspects of the physical limitations included in the RFC.

1. **Hearing Loss**

Scattered throughout Plaintiff's Brief in Chief [Doc. No. 16] are arguments loosely connected to the ALJ's alleged error in assessing the functional limitations attributable to Plaintiff's hearing loss. First, Plaintiff challenges the wording of the ALJ's RFC determination. According to Plaintiff, including the "nonspecific qualifying term (moderate)," rendered the ALJ's RFC "internally inconsistent." [Doc. No. 16] at 2. Plaintiff argues the terms used in the RFC to characterize Plaintiff's hearing impairment "cancel each other out" because "[q]uiet, moderately loud, as well as loud environments" means Plaintiff "can work everywhere, a little to a lot noisy, or not." [Doc. No. 16] at 3-4. Thus, Plaintiff argues, there is "no hearing limitation left in the RFC." *Id.* at 4.

The underpinning of Plaintiff's argument is not sound because it depends on the false premise that no person with a hearing loss could ever work in a loud work environment. Plaintiff's argument fails to take into account that severe impairments identified by the ALJ are relevant to a disability determination only in so far as they result in functional limitations that would preclude the ability to work. The mere existence of a "severe" impairment is insufficient to prove disability. Rather, a claimant must demonstrate that his impairment is so functionally

limiting as to prevent him from engaging in any substantial gainful activity. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Walton*, 535 U.S. 212, 219-220 (2002) (claimant must demonstrate he is unable to engage in any substantial gainful activity because of an impairment).

Contrary to Plaintiff's contention, the ALJ's RFC formulation does include a limitation attributable to Plaintiff's hearing loss that is not "cancelled out." The ALJ specifically stated that if Plaintiff is performing a job in a loud environment, he must wear ear protection. AR 17. That limitation was also included in the hypothetical question to the VE. AR 57-58. Considering Plaintiff's RFC as presented by the ALJ in her hypothetical question, the VE testified that Plaintiff would be able to perform the duties of three representative jobs as they are described in the Dictionary of Occupational Titles (DOT), the definitive Department of Labor publication for determining the functional requirements of jobs existing in the national economy.

The VE identified the jobs Plaintiff could do by both title and DOT section number. The first job she identified was Solderer, DOT 813.684-022, 1991 WL 681592. The VE stated there were 10,000 such jobs in the state and 316,000 in the national economy. The second job she identified was Assembler of Small Parts, DOT 706.684-022, 1991 WL 679050. The VE testified there were 1,100 such jobs in the state and 239,000 in the national economy. The final representative job the VE identified was Bagger, DOT 920.687-018, 1991 WL 687-018. The VE stated there were 5,000 such jobs in the state and 660,000 in the national economy. AR 58-59. As required by the regulations, the ALJ specifically asked the VE whether any of her testimony was inconsistent with information about these jobs in the DOT. AR 59-60. The VE stated her testimony was consistent with job descriptions in the DOT, and this Court's review of the relevant DOT sections confirmed that testimony.

The DOT describes in detail the physical exertional requirements, the mental requirements and the level of preparation necessary to do each job listed. Additionally, the DOT describes numerous other requirements that might affect whether a given claimant could perform a particular job, such as jobs requiring the sensory abilities to taste, feel or hear. The DOT also describes the environments in which the job is performed and the environmental characteristics of the workplace that might affect a claimant's ability to perform that job, such as jobs requiring the ability to work in high exposed places, around dangerous machinery, in wet or humid places, or loud environments.

Sensory requirements considered are "Tasting, Feeling and Hearing," and one of the environmental characteristics is "Noise Level." Plaintiff correctly notes that the jobs of "Solderer" and "Assembler of Small Parts," as they are described in the DOT, generally are performed in an environment where the noise level is "Loud." According to the ALJ's RFC, these two jobs would require Plaintiff to wear ear protection. But for the job of "Solderer" the sensory requirement for "Hearing" is "Not Present—Activity or condition does not exist." For the job of Assembler of Small Parts, the sensory requirement for "Hearing" is "Occasionally—Exists up to 1/3 of the time." The job of "Bagger" as described in the DOT, is generally performed in an environment where the noise level is "Moderate," and the sensory requirement for "Hearing" is "Not Present—Activity or condition does not exist." Thus, under the ALJ's RFC, Plaintiff's hearing impairment would not have prevented him from performing at least two of the jobs identified by the VE, "Solderer" and "Bagger," because these jobs do not require a claimant to hear.

Plaintiff does not dispute that the Solderer and Bagger jobs exist in significant numbers in the national economy. Thus, even if Plaintiff could not do a job fitting under the Assembler of

Small Parts category, the other two jobs identified by the VE are sufficient to support the ALJ's step-five finding that, before Plaintiff's age category changed, jobs existed in significant numbers in the national economy that Plaintiff could have performed.

In the portion of his brief entitled "Great Weight Error," Plaintiff attempts to undermine the ALJ's RFC determination by stating, the "agency doctor that received *great weight* … held the opinion that [Plaintiff] needed to 'avoid even moderate exposure to noise.'" [Doc. No. 16] at 3 (emphasis in original). The opinion to which Plaintiff refers is a Physical Residual Functional Capacity Assessment form completed by J. Marks-Snelling, D.O. AR 446-453. In the checklist portion of the form under "Environmental Limitations," Dr. Marks-Snelling marked a box next to "Noise" under the heading, "Avoid Even Moderate Exposure." AR 450. But the narrative section of the form explains the doctor's findings regarding Plaintiff's actual functional limitations attributable to his hearing:

> No hearing loss alleged on 3368, but at ICE he do [sic] decreased hearing. Able to hear conversational voice at exam, but the doctor had to raise his voice and repeat questions several times. No hearing loss noted at FO interview.
>
> 11/02/10 audiology testing revealed a severe to profound sensorineural high-frequency hearing loss in right ear from 1500-1800 Hz. Word recognition scores were 40% right ear and 60% left at 60 dBHL, and 80% bilat at 80 dBHL.
>
> Can hear to communicate with coworkers and supervisors.

The written explanation of Plaintiff's hearing limitations does not support a conclusion that Plaintiff must literally avoid a work environment free from loud noise for reasons unrelated to his ability to hear. The check box form with its limited choices, standing alone, is inadequate to describe functional limitations. The written explanation, on the other hand, does describe Plaintiff's functional limitations. Arguably, the last sentence supports a conclusion that Plaintiff could even perform the job of Assembler of Small Parts, which requires hearing only

7

occasionally. The ALJ adequately stated the functional limitations attributable to Plaintiff's hearing loss, and the jobs identified by the VE, as described in the DOT, were not foreclosed by those functional limitations.

### 2. Physical RFC

Plaintiff contends the RFC for light work "runs counter to the evidence and his testimony[.]" [Doc. No. 16] at 5. Plaintiff alleges "he must lie down frequently to rest and cannot walk very far, has chest pain and shortness of breath, all of which is confirmed by his treating physician." *Id.* The "evidence" to which Plaintiff points consists of three medical records, only two of which are actually from Plaintiff's treating physician, Dr. Suresh Chandrasekaran. AR 426, 527. While these two routine reports mention shortness of breath as a symptom, both are silent as to Plaintiff's alleged need to lie down frequently. The third document cited by Plaintiff is part of the report of the consultative examiner, Dennis Brennen, D.O., and is based solely on Plaintiff's subjective complaints. AR 337. This document, too, is devoid of evidence supporting Plaintiff's claim that he must frequently lie down. The ALJ found Plaintiff's statements regarding the intensity, persistence and limiting effects of his impairments were not entirely credible. Plaintiff does not challenge the ALJ's credibility determination, and the evidence upon which Plaintiff relies does not undermine the ALJ's decision in this respect and does not support a more restrictive physical RFC.

### 3. "Equaling a Listing"

Plaintiff contends there is "no solid explanation in the decision that the ALJ considered the *combined effect* of all of [his] impairments *collectively*, to determine if he *equaled* a listing at step three." [Doc. No. 16] at 7 (emphasis in original). Plaintiff argues his "hearing *alone*" was "only 20% off the listing for hearing" in one ear. *Id.* (emphasis in original). He also argues he

has "unstable angina." *Id.* To support his claim of "unstable angina," Plaintiff cites two medical records. The first is a report by his treating physician describing the course of a hospitalization and the treatment Plaintiff received. At that time, Plaintiff was admitted into the hospital because of his "unstable angina," but after he had a coronary arteriography with stenting, he was discharged in "stable" condition. AR 390-391. The second record describes the surgical procedures performed during the same hospitalization. AR 408.

Plaintiff attempts to make the case that the ALJ erred in that she "disregarded the significance of the totality of all of [Plaintiff's] evidence and the limitations therefrom[.]" *Id.* But Plaintiff's proposed approach to a step-three determination of equivalency has been rejected by the Social Security Agency:

> Where an individual has a combination of impairments, none of which meets or equals a listed impairment, and each impairment is manifested by a set of symptoms and relevant signs and/or abnormal laboratory findings, the collective medical findings of the combined impairments must be matched to the specific set of symptoms, signs, and laboratory findings of the listed impairment to which they can be most closely related. *The mere accumulation of a number of impairments will not establish medical equivalency.* In no case are symptoms alone a sufficient basis for establishing the presence of a physical or mental impairment.

"TITLES II AND XVI: THE SEQUENTIAL EVALUATION PROCESS," Social Security Regulation 86-8, 1986 WL 68636, at *4. (emphasis added).

Plaintiff also takes issue with the ALJ's use of the term "stable" to describe Plaintiff's cardiac disease. He states, "The term stable should not be used in an ALJ opinion." According to Plaintiff, "This Circuit has cautioned ALJ's from using such a term to define a condition." [Doc. No. 16] at 8. If, as Plaintiff declares, the Tenth Circuit has issued such a caution, Plaintiff has not revealed the source. Rather, Plaintiff has plucked one paragraph from a Second Circuit case, *Kohler v. Astrue*, 546 F.3d 260, 268 (2d Cir. 2008), in which the term "stable" had been

used in a completely different context. In *Kohler*, the ALJ had erred as a matter of law in failing to use the Psychiatric Technique to evaluate the severity of the claimant's mental impairment. The ALJ had relied on one report from a nurse practitioner who had stated the claimant had been "stable" for several years with only one episode of mania." *Id.* The Second Circuit emphasized that the ALJ took the term "stable" to mean the claimant's mental condition had "been good when the term could mean only that her condition has not changed, and she could be stable at a low functional level." *Id.*

As discussed above, the term "stable" used to describe Petitioner's cardiac disease does not have the same ambiguous meaning that it did in *Kohler*. Here, the medical record used the term "stable" to indicate Plaintiff's angina had been successfully treated after he presented at the hospital with "unstable angina." Thus, *Kohler* actually stands for the proposition that ALJs should use the special technique when evaluating the severity of mental impairments. It does not stand for the proposition that an ALJ should never use the word "stable" to describe a condition.

### B. "Nonseveres"

Plaintiff alleges he has two impairments, back pain and depression, that are not severe. He contends the ALJ erred in failing to consider the combined effect of the alleged nonsevere impairments and his severe hearing loss and coronary disease. To support the existence of these alleged "nonseveres," Plaintiff cites two medical records, both from 2010, and both of which record "depression" and "back pain" as part of Plaintiff's "Past Medical History." AR 322, 326. Plaintiff cites no evidence to support a conclusion that Plaintiff was diagnosed or treated for either back pain or depression during the relevant time period or that his functional limitations were impacted by these conditions.

## C. Application of Medical-Vocational Guidelines

As Plaintiff correctly states, the ALJ used the Medical-Vocational Guidelines, commonly known as "the grids," at step five of the sequential evaluation and found Plaintiff to be disabled when he changed age categories from "closely approaching advanced age" to "advanced age." Plaintiff contends there is "nothing in this decision reflecting how the evidence changed, or more perfectly, supported how the ALJ decision was made different on September 14, 2013 that supports her 'favorable' decision on that date." [Doc. No. 16] at 9. Plaintiff seeks reversal on the basis that the ALJ "applied the GRID rules mechanically to determine he was disabled on that date." *Id.*

In an attempt to support his arguably nonsensical argument, Plaintiff cites an obsolete section of the Hearings, Appeals and Litigation Law Manual (HALLEX). HALLEX is a source used internally by the Agency to aid ALJ's and Appeals Council judges in their consideration of disability cases. The HALLEX manual is not actually published for use outside the Agency, but it is available for inspection and copying in the field offices of the Office of Hearings and Appeals. 20 C.F.R. § 402.60(b).

Other than sections of the HALLEX that simply repeat a regulation, the provisions of the HALLEX do not have the force of law, are not binding on the Commissioner, and do not provide a basis for the Court to rule. *See McCoy v. Barnhart*, 309 F.Supp.2d 1281, 1284 (D. Kan. 2004).

The obsolete section to which Plaintiff refers, HALLEX II-5-3-2 offered guidance to ALJs faced with claimants whose ages were near a change in age category, but who did not reach that age before their insured status expired. The section was later revised and renumbered. The concept of the current section is fundamentally the same as the one it replaced:

> When determining disability, the Social Security Administration (SSA) will use each of the age categories applicable to a claimant during the period for which

> SSA is determining whether the claimant is disabled. SSA will not apply the age categories mechanically in a borderline age situation. If a claimant is within a few days to a few months of reaching an older age category (hereinafter "higher age category"), *and using the higher age category would result in a determination or decision that the claimant is disabled*, SSA will consider whether to use the higher age category after evaluating the overall impact of all the factors of the case. *See* 20 CFR 404.1563 and 416.963.

HALLEX I-3-3-25. BORDERLINE AGE, 2016 WL 1167002 at *1 (emphasis added).

Plaintiff's argument reveals a fundamental misunderstanding of both the Medical-Vocational Guidelines and the section of the HALLEX he cites in support. The grids were developed for use by ALJs as an aid in considering individuals who fit all criteria of a given rule. One of the basic premises underlying the grids is that the older a person is, the harder it would be for him to adapt to a different vocation. In this case, Plaintiff reached "advanced age" before his insured status expired. Therefore, the ALJ applied the grids directly and determined Plaintiff was disabled after the date he reached "advanced age." The ALJ's use of the grids was not "mechanical" as that term is used in the HALLEX. The ALJ's use of the grids was precise.

Because the ALJ's decision is supported by substantial evidence and sound as a matter of law, the decision should be affirmed.

## **RECOMMENDATION**

In sum, the Commissioner's final decision should be affirmed. The RFC is defined in sufficiently clear terms and includes all impairments found by the ALJ and supported by the administrative record. The jobs identified by the VE are consistent with their definitions in the DOT and the ALJ's RFC. The ALJ's use of the Medical-Vocational Guidelines is precise and inures to the benefit of the Plaintiff. The decision of the ALJ should be affirmed.

## NOTICE OF RIGHT TO OBJECT

The parties are advised of their right to object to this Report and Recommendation. *See* 28 U.S.C. § 636. Any objection must be filed with the Clerk of the District Court by September 5, 2016. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to make timely objection to this Report and Recommendation waives the right to appellate review of the factual and legal issues addressed herein. *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991).

## STATUS OF REFERRAL

This Report and Recommendation terminates the referral by the Chief District Judge in this matter.

ENTERED this 22nd day of August, 2016.

_____
BERNARD M. JONES
UNITED STATES MAGISTRATE JUDGE